UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

DAVID STOGSDILL, )
 )
       Plaintiff, )
 )
    v. ) No. 4:16 CV 1212 DDN
 )
NANCY A. BERRYHILL,[1] )
Acting Commissioner of Social Security, )
 )
       Defendant. )

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff David Vaughn Stogsdill for disability insurance benefits (DIB) and supplemental security income (SSI) benefits under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401 et seq.; 1381 et seq. The parties consented to the exercise of plenary authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

## I. BACKGROUND

Plaintiff David V. Stogsdill, born September 1, 1986, applied for DIB and SSI benefits under Title II and XVI of the Act on April 23, 2013, and May 10, 2013, respectively. (Tr. 119, 121). Plaintiff alleged his disability began on November 12, 2012, at the age of 26. (Tr. 119, 121). According to his disability report, plaintiff claimed he

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), Ms. Berryhill is hereby substituted for Carolyn W. Colvin as Acting Commissioner of Social Security and as the defendant in this suit. 42 U.S.C. § 405(g) (last sentence).

was disabled due to epilepsy. (Tr. 158). Plaintiff's application was initially denied on September 30, 2013, and he filed a Request for Hearing by an ALJ on October 7, 2013. (Tr. 58-67). On April 1, 2015, following a hearing, an ALJ found that plaintiff was not disabled under the Act and that plaintiff had the residual functional capacity (RFC) to perform jobs that existed in significant numbers in the national economy. (Tr. 8-20).

On June 14, 2016, the Appeals Council denied plaintiff's request for review. (Tr. 1-5). Thus, plaintiff has exhausted his administrative remedies, and the ALJ's decision stands as the final decision of the Commissioner subject to judicial review.

## II. MEDICAL HISTORY

On November 13, 2012, plaintiff visited David Mattson, M.D., regarding his seizure disorder. (Tr. 382). Dr. Mattson noted that plaintiff has stable seizure frequency but still struggles with smaller intractable events. (Tr. 383). For example, Dr. Mattson noted that plaintiff has had no definite generalized tonic-clonic (GTC) seizure, also known as grand mal seizure, during which plaintiff suddenly loses consciousness and undergoes intense muscle contraction and jerking. However, Dr. Mattson noted that plaintiff continued to have smaller events, referred to as complex partial seizures (CPS), and feelings of depersonalization. Dr. Mattson also noted that, per plaintiff's mother, plaintiff's marijuana use had become more frequent and that he had been having a hard time focusing during work. (Tr. 382). Dr. Mattson opined that plaintiff's continued use of marijuana could be contributing to his persistent cognitive issues. (Tr. 383). Dr. Mattson emphasized the significance of plaintiff's "underlying psychiatric issues and the importance of consistent psychiatric follow-up." However, while struggling with low mood, plaintiff denied having any suicidal or homicidal ideation. (Tr. 382). Plaintiff's general and neurological exams both showed normal results. Dr. Mattson offered plaintiff a referral to Washington University for surgical evaluation and suggested Vagus Nerve Stimulation (VNS), but plaintiff declined this treatment. (Tr. 383).

On February 28, 2013, plaintiff returned to Dr. Mattson regarding his seizure disorder. Dr. Mattson noted that plaintiff had overall stable seizure frequency with no definite GTC but was still getting smaller intractable events about every two weeks. Dr. Mattson reiterated the significance of plaintiff's underlying psychiatric issues and the importance of "consistent psychiatric follow-up." Plaintiff's general and neurological exams both showed normal results. (Tr. 379). Again, emphasizing that plaintiff's chances of seizure freedom with medication are small, Dr. Mattson offered plaintiff a referral to Washington University for surgical evaluation and suggested VNS, but plaintiff still declined. (Tr. 380).

On June 17, 2013, plaintiff returned to Dr. Mattson regarding his seizure disorder. (Tr. 424). Dr. Mattson noted that plaintiff had overall been stable until three days prior to the visit, when he suffered a single GTC. However, Dr. Mattson opined that this GTC may have been triggered by the narcotics given to him few days before the event as a treatment for a boil under his arm. As for smaller intractable events, Dr. Mattson noted that plaintiff was experiencing events about every two weeks, as before. (Tr. 424). Dr. Mattson reiterated the importance of consistent psychiatric follow-up and suggested options for surgery and VNS, but plaintiff still declined. (Tr. 424-25). Plaintiff's general and neurological exams both showed normal results. (Tr. 424).

On August 14, 2013, plaintiff visited R. Edward Hogan, M.D., at Washington University in St. Louis, on Dr. Mattson's referral, for evaluation of CPS. (Tr. 437). Dr. Hogan noted that plaintiff first developed seizures in 2006 after taking methamphetamine daily for two months. At that time, the seizures occurred approximately once every two and a half months. (Tr. 437). Dr. Hogan also noted that plaintiff has a history of alcohol abuse and history of drug abuse with substances including methamphetamine, heroin, cocaine, mushrooms, and almost daily marijuana usage since the age of 12. Dr. Hogan listed as risk factors for plaintiff's epilepsy "drug abuse, family history of seizures, and hypoxia at birth." (Tr. 438). Dr. Hogan emphasized that observations of plaintiff's past neurological activities via video electroencephalography (EEG) in January 2012, during

which plaintiff was monitored 24 hours for five consecutive days, revealed that six out of seven events were non-epileptic seizures. (Tr. 438-39). Moreover, Dr. Hogan noted that plaintiff's one hour EEG and magnetic resonance imaging (MRI) test results in September 2009 were also normal. (Tr. 438). Based on these results, Dr. Hogan opined that it is "not confirmed that all of [plaintiff's] symptoms are related to epileptic seizures." (Tr. 438-39). As for plaintiff's current conditions, Dr. Hogan noted that plaintiff rarely experiences GTC, but has CPS weekly to every two to three weeks. (Tr. 437). Plaintiff's general and neurological exams both showed normal results. (Tr. 438). Dr. Hogan restricted plaintiff to "no driving, heights, swimming or bathing alone, operating heavy machinery or other activities during which seizures would endanger him or others." (Tr. 439). Dr. Hogan also suggested plaintiff undergo video EEG monitoring and epilepsy surgery. Plaintiff only agreed to video EEG monitoring. (Tr. 439).

On September 26, 2013, plaintiff and his mother called Dr. Hogan at Washington University and expressed their concern about video EEG monitoring when plaintiff had not had any seizures in almost eight weeks, worried that it might cause him to have seizures again. In response, Dr. Hogan reassured plaintiff and his mother that video EEG monitoring would be beneficial to plaintiff regardless of his recent seizure control. Plaintiff agreed to come in for video EEG monitoring on October 2, 2013. However, plaintiff's mother cancelled the scheduled video EEG monitoring, against the advice of both Dr. Hogan and Dr. Mattson. (Tr. 449, 559).

On December 17, 2013, plaintiff returned to Dr. Mattson regarding his seizure disorder. (Tr. 440). Dr. Mattson noted that plaintiff had stable seizure frequency with no recent GTC but a CPS about every four to six weeks. Dr. Mattson also noted that plaintiff failed to follow through on any of the recommendations he received from Washington University, including the long-term monitoring. Plaintiff's general and neurological exams both showed normal results. (Tr. 440).

## III. ALJ HEARING

On January 28, 2015, plaintiff testified at a hearing before the ALJ. (Tr. 23-28; 33-35). Plaintiff stated that he is unable to work due to epilepsy and that he gets seizures at least monthly but not quite on a weekly basis. (Tr. 25-27). Plaintiff stated that seizures make him wander around at work, lose awareness of his surroundings and of his own actions, and get massive depression afterwards. (Tr. 25). Plaintiff stated that he also gets crying spells "probably daily" from depression, which tends to get more severe after seizures. (Tr. 26).

Plaintiff's mother, Kathy Lindsay, also testified at the hearing. (Tr. 29). She stated that plaintiff gets GTC a lot less with medication, but he gets either simple or complex partial seizures on a weekly basis. She stated that if plaintiff misses partial seizures one week, he might get two the following week. She stated that right after the seizure plaintiff loses the sense of taste for few days and that the left side of his face remains sagged for few hours. (Tr. 31). She also stated that plaintiff does not want to undergo brain surgery because it's very doubtful that the surgery will fix the partial seizures, and because plaintiff might suffer from strokes or other negative side-effects from the surgery. (Tr. 32).

On February 11, 2015, the ALJ submitted Vocational Interrogatory to a vocational expert (VE). (Tr. 228). The ALJ asked if a hypothetical individual of plaintiff's age, education, work experience, and RFC can perform any of plaintiff's past jobs[2] or any unskilled occupations with jobs that exist in the national economy. (Tr. 230-31). The VE responded that while such individual could not perform plaintiff's past jobs, the individual could perform as a small products assembler (250,000 jobs nationally and 3,000 jobs locally), surveillance system monitor (81,000 jobs nationally and 500 jobs locally) or parking cashier (150,000 jobs nationally and 1,000 jobs locally). (Tr. 235-36).

---

[2] In succession, plaintiff worked in lawncare, in sports officiating, as a cashier, as a cook, as a cook/dishwasher, and in a medical book and supplies warehouse. (Tr. 171).

- 5 -

## IV. DECISION OF THE ALJ

On April 1, 2015, the ALJ found that plaintiff met the insured status requirements of the Act throughout the period of the decision but that plaintiff is not disabled within the meaning of the Act. (Tr. 11, 13).

At Step One, the ALJ found that plaintiff has not engaged in substantial gainful activity since the alleged onset date of disability. (Tr. 13).

At Step Two, the ALJ found that plaintiff has the following medically determinable impairments that are "severe" within the meaning of 20 CFR § 404.1520(c) and 416.920(c): epilepsy, a depressive disorder, and marijuana abuse. (Tr. 12-13).

At Step Three, the ALJ found that plaintiff's conditions have not met or medically equaled a listing in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13). For plaintiff's epilepsy, the ALJ found that plaintiff's medical records don't show the requisite episodic frequency under Listings 11.02 and 11.03 for convulsive and non-convulsive epilepsy. For plaintiff's depressive disorder and marijuana abuse, the ALJ found that plaintiff's medical records do not satisfy either section B or C under Listing 12.04 for affective disorders. (Tr. 13).

At Step Four, the ALJ found that plaintiff cannot perform his past relevant work (PRW). (Tr. 15). The ALJ found that plaintiff has not had any episodes of decompensation of extended duration. (Tr. 13). Thus, the ALJ found that plaintiff has had no more than mild restrictions of activities of daily living and no more than mild difficulties in maintaining social functioning, concentration, persistence and pace. Then, the ALJ reviewed the entire record and found that plaintiff has the RFC to perform sedentary work, as defined in 20 CFR §§ 404.1567 and 416.967, but is unable to: climb ladders, ropes, or scaffolds; drive; have operational control of heavy machinery; or work at unprotected heights. Also, the ALJ found that plaintiff can only perform simple,

routine, repetitive tasks in a "low-stress environment," which is defined as requiring no more than occasional decision-making and changes in the work setting. (Tr. 14).

At Step Five, the ALJ, relying on the testimony of a VE, found that a significant number of jobs exist both in the local and national economies that plaintiff would be able to perform. (Tr. 16).

## V. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id*. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. *Id*. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. *See Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); *Pate-Fires*, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing the five-step process); *Pate-Fires*, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3)

his disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW. *Id*. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating he is no longer able to return to his PRW. *Pate-Fires*, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. *Id*.; 20 C.F.R. § 404.1520(a)(4)(v).

## VI.  DISCUSSION

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in three respects. First, plaintiff argues that the ALJ erred in determining plaintiff's RFC by selectively reading the medical records and failing to properly consider all of the third-party testimony. Second, plaintiff argues that the ALJ improperly considered plaintiff's substance abuse and non-compliance with suggested medical treatments in making credibility findings. Third, plaintiff argues that these flawed RFC findings led to flawed vocational interrogatories and VE testimony, which failed to capture the concrete consequences of plaintiff's seizure condition and are insufficient to support the ALJ's conclusions at Steps Four and Five. This court disagrees.

### A. The ALJ Properly Determined Plaintiff's RFC

Plaintiff argues that the medical records as a whole indicate that he does not possess the RFC to perform sedentary work, as defined in 20 CFR §§ 404.1567 and 416.967. Plaintiff seems to argue that some medical evidence does not support the findings of the RFC, but does not specify which medical evidence contradicts the ALJ's assessment of the RFC. (Doc. 17 at 7-8).

The court concludes that the ALJ properly considered all relevant medical evidence, including plaintiff's own description of his limitations, and incorporated into the decision medical opinions of the treating physician and the state-agency physician who reviewed plaintiff's records. *See McGeorge v. Barnhart*, 321 F.3d 766, 768 (8th Cir. 2003). Importantly, the ALJ found that Dr. Hogan, plaintiff's treating physician, merely restricted plaintiff from "driving, being at heights, swimming or bathing alone, operating heavy machinery, and performing any other activity that would endanger plaintiff or others" in case of seizure. Dr. Hogan stated that plaintiff is able to perform simple, routine, repetitive tasks in a low-stress environment, "low stress" being defined as requiring no more than occasional decision-making and no more than occasional changes in the work setting. The ALJ expressly adopted these limitations and did not find plaintiff's RFC to be restricted in any other way. (Tr. 14).

The ALJ properly relied on Dr. Hogan's opinion, finding that it was consistent with the evidence of record, including the opinion of state-agency physician Dr. Smith, who gave the same medical opinion as that of Dr. Hogan after fully reviewing plaintiff's medical records. (Tr. 14). He therefore properly gave it controlling weight. *See* 20 C.F.R. §§ 404.1527 and 416.927. The treatment notes for the relevant period of 12 months after the alleged onset date reveal that plaintiff only experienced one GTC event, which appears to have been provoked by an unrelated medical treatment. (Tr. 424). For CPS, the treatment notes reveal that plaintiff's episodic frequency had decreased over time. (Tr. 379, 382, 424, 437, 440). Specifically, at or about the alleged onset date, plaintiff was experiencing CPS approximately at a rate of once every two weeks, but by June 2013, this rate was reduced to roughly once every two to three weeks. (Tr. 382, 424). Then, on September 27, 2013, plaintiff's mother called Dr. Hogan and confirmed that plaintiff had not experienced any type of seizure for almost eight weeks in a row. (Tr. 449). In addition, both neurological and general exams performed by treating physicians during the relevant period consistently showed normal results. (Tr. 379, 382, 424, 437, 440).

Plaintiff also appears to suggest that the ALJ's RFC assessment is improper because the treatment notes consistently state that plaintiff's CPS condition is "intractable." (Doc. 17 at 8). This argument is without merit. Plaintiff has produced no evidence nor can the court find any evidence that the intractability of plaintiff's condition somehow diminishes his RFC. The ALJ adopted the restrictions imposed by the very doctor who opined that plaintiff's condition was intractable, and there is no obvious inconsistency in a condition being intractable and yet not limiting a person beyond the restrictions Dr. Hogan and the ALJ listed in plaintiff's RFC. The treatment notes do not, therefore, reveal any error in the ALJ's determination of plaintiff's RFC. While the treatment notes state that plaintiff's CPS condition is intractable, the medical records show that plaintiff's CPS events have reduced in frequency through medication and are not as frequent as plaintiff claims. (Tr. 10, 379, 382, 424, 437, 440). Thus, the ALJ properly considered the medical records in determining plaintiff's RFC. (Tr. 10).

Lastly, plaintiff argues that the ALJ failed to properly comment on the third-party testimony regarding the consistency of the subjective complaints.[3] When determining RFC, the Commissioner must consider all relevant medical and other evidence, including descriptions and observations of the limitations by both the plaintiff and others such as family or friends. 20 C.F.R. § 404.1545(a)(3). To the extent the statements contain opinions, the ALJ "generally should explain the weight given to [nonmedical source] opinions." 20 C.F.R. § 404.1527(f)(2). However, the ALJ may discount third-party testimony on the same grounds as he or she discounts a claimant's own testimony. *Black*

---

[3] Plaintiff's contention that Social Security Ruling 16-3p requires the ALJ to explicitly comment on the third-party testimonies is meritless. (Doc. 17 at 11). At the time of the ALJ's decision on April 1, 2015, Social Security Ruling 96-7p, which was later rescinded by SSR 16-3p on March 16, 2016, was still in force. Although SSR 16-3p requires the ALJ to explicitly discuss and evaluate a plaintiff's subjective complaints, the rescission of SSR 96-7p would not appear to have any practical effect on the outcome on this point, as both Rulings instruct the ALJ to merely consider third-party observations and nonmedical opinion testimony, and SSR 16-3p does not clarify or change the Commissioner's duties on this point.

*v. Apfel,* 143 F.3d 383, 387 (8th Cir. 1998). And "the failure to discuss lay witness credibility is not reversible error in cases in which the ALJ made an express credibility determination of the plaintiff, and the evidence leading the ALJ to discredit the plaintiff's testimony also discredits the third-party testimony." *Roberts v. Astrue,* No. 1:11 CV 75 CEJ, 2012 WL 3939960, at *5 (E.D. Mo. September 10, 2012); *accord Buckner v. Astrue,* 646 F.3d 549, 559–60 (8th Cir. 2011) (finding ALJ's failure to explicitly address observations of claimant's girlfriend did not require remand when the observations were identical to claimant's statements and ALJ discounted credibility of claimant).

Here, the ALJ stated that he considered the record and the opinions of record (Tr. 13-14, 19) but only explicitly addressed the lay observations of plaintiff and his mother, who was also plaintiff's co-worker and whose observations were practically identical to those contained in the other third-party statements. (Tr. 15, 168, 172, 178, 221-27, 243-44). The third-party statements do not add any information that plaintiff and his mother did not claim themselves: over the approximately thirteen months that plaintiff worked with these individuals (Tr. 227), three co-workers described witnessing one seizure (Tr. 221, 223, 224), another stated he "witnessed a few different episodes" (Tr. 222), and another supervisor and co-worker stated they witnessed multiple seizures that made plaintiff miss full and partial days of work. (Tr. 225-26). None of the co-worker statements include relevant details not included in the statements of plaintiff or his mother. (Tr. 168, 172, 178, 221-27, 243-44).

Although the ALJ did not explicitly refer to each co-workers' observations in his decision, plaintiff's argument is meritless. Failure to specifically discuss and cite evidence does not mean that it was not considered by the ALJ. *Wildman v. Astrue,* 596 F.3d 959, 966 (8th Cir. 2010). The ALJ made an express credibility determination of the plaintiff, and the evidence leading the ALJ to discredit plaintiff's testimony also discredits the third-party testimony: the ALJ considered plaintiff and his mother's statements to be inconsistent with the preponderance of the medical evidence. (Tr. 15). The third-party

statements do not negate the ALJ's determination of plaintiff's RFC, and it was not reversible error for the ALJ to fail to explicitly discuss them.

### B. The ALJ Made Lawful Credibility Findings

Plaintiff next argues that the ALJ improperly discredited plaintiff's subjective complaints. An ALJ must to point to specific reasons for the weight given to a claimant's testimony. 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3). In this case, the ALJ pointed to several appropriate factors that constitute sufficient evidence to discredit plaintiff's complaints.

First, the ALJ noted that plaintiff's substance abuse persisted throughout the period of alleged disability and undermined his subjective complaints. (Tr. 15). In challenging the ALJ's consideration of this factor, plaintiff relies on a treatment note from one of plaintiff's physicians that lists plaintiff's prior drug history without commenting on its effects. (Doc. 17 at 12). The note did not say plaintiff's drug history had no effect on plaintiff's condition, it merely did not comment on it at all. (Tr. 251-52). However, elsewhere in the medical records, plaintiff's treating physicians listed daily marijuana use as an aggravating factor for plaintiff's mental condition, and drug abuse as a risk factor for epilepsy. (Tr. 382, 438, 455). Moreover, the medical records note that plaintiff first developed seizures in 2006 after taking methamphetamine and heroin daily for two months. (Tr. 15, 437-38). Accordingly, there is substantial evidence supporting the ALJ's determination that plaintiff's drug abuse was a discrediting factor.

Second, the ALJ noted that plaintiff failed to follow the suggested medical options of vagus nerve stimulation and video EEG monitoring. (Tr. 15). In *Guilliams v. Barnhart*, the Eighth Circuit Court ruled that a failure to follow a recommended course of treatment weighs against plaintiff's credibility. *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005). Although plaintiff argues that the ALJ was obligated to determine whether these treatments would restore plaintiff's ability to work, this argument is premised on 20 C.F.R. §§ 404.1530(a) and 416.930(a), which apply only when the ALJ has determined

- 12 -

that a claimant's impairment is disabling but could be improved by an available treatment. *See* 20 C.F.R. §§ 404.530(a) and 416.930(a). The ALJ did not determine that plaintiff's impairments were disabling, but merely considered plaintiff's failure to comply with treatment recommendations in considering his credibility. While there were some risks associated with the nerve stimulation, plaintiff failed to even attend a surgical consultation. (Tr. 379, 383, 440). There were no risks associated with the video EEG monitoring, which Dr. Hogan recommended to better track his seizures and their onset, in order to determine the best treatment plan, but plaintiff failed to participate. (Tr. 439, 559). Plaintiff also failed to obtain recommended psychiatric treatment. (Tr. 379, 383, 424-25).

In addition, the ALJ pointed out that there is a nearly seven-year gap between plaintiff's initial epilepsy event in 2006 and the filing of plaintiff's disability application. (Tr. 15). The ALJ noted that plaintiff continued working and did not file his application until April 2013. (Tr. 15). Moreover, and as discussed above, the objective medical evidence is inconsistent with plaintiff's complaints.

"We defer to the commissioner's credibility determinations if they are supported by good reasons and substantial evidence." *Cline v. Colvin*, 771 F.3d 1098, 1102 (8th Cir. 2014). The ALJ did not err in discrediting plaintiff's subjective complaints based on the factors discussed. He articulated the inconsistencies on which he relied in discrediting plaintiff's subjective complaints, and those inconsistencies are supported by good reason and substantial evidence.

### C. The VE's Testimony Forms Substantial Evidence at Step Five

Lastly, plaintiff argues the hypothetical situation presented to the VE did not capture the concrete consequences of his impairments. (Doc. 17 at 15-16). In order for a hypothetical question to serve as substantial evidence, the question must entirely describe the plaintiff's individual impairments. *Lacroix v. Barnhart*, 465 F.3d 881, 889 (8th Cir. 2006) ("Testimony based on hypothetical questions that do not encompass all relevant

impairments cannot constitute substantial evidence to support the ALJ's decision"). However, the hypothetical question presented to the VE need not use specific diagnostic terms. *Howard v. Massanari*, 255 F.3d 577, 581-82 (8th Cir. 2001). The ALJ is only required to include in the hypothetical question those impairments and restrictions she found credible, and she can exclude complaints of pain when those complaints are determined not to be credible. *Guilliams v. Barnhart*, 393 F.3d 798, 804 (8th Cir. 2005).

Plaintiff does not specifically argue how the hypothetical question was deficient, other than that "was based upon a flawed residual functional capacity." (Doc. 17 at 16). As discussed above, however, the ALJ properly considered all relevant medical evidence and found that plaintiff has the RFC to perform sedentary work as defined in 20 CFR §§ 404.1567 and 416.967, with additional, specified limitations. (Tr. 14). The ALJ's vocational interrogatories to the VE mirrored the RFC determination, and accordingly captured the concrete consequences of plaintiff's seizure conditions. (Tr. 228-37). As the hypothetical questions posed to the VE were proper, the VE's opinions are substantial evidence that plaintiff is able to perform jobs that exist in significant numbers in the national economy.

## VII. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on August 22, 2017.